All right, be seated, please. I have your stuff and you have mine. Yes, why don't we do some shifting here? Yeah, we need to shift. Apologize for the courtroom being warm. We've been trying to fix this since seven this morning. And the professionals haven't seemed to. People can't get used to the fact that we're together. But I'm there. Do you have your stuff? Yep. OK. All right. All right, first case we'll hear this morning is Duke Energy versus NTA Carolina. And Mr. Ho, we'll hear from you first. Good morning, Judge Niemeyer. May it please the court. NTE specializes in building cleaner, more cost effective electricity plants that can provide power to customers at substantially lower prices. About 10 years ago, NTE dared to challenge Duke's monopoly in the Carolinas and successfully gained a foothold in that area, taking nine wholesale customers from Duke. That entry clearly benefited consumers. As the mayor of Stantonsburg, North Carolina said, Christmas will be brighter for our citizens because NTE's rates were 9% lower than Duke's. Duke knew that it could not compete on the merits, I'm sorry, with NTE because its costs were 30% higher than NTE's. So it waged a deliberate campaign to prevent NTE from competing, and in particular, to block NTE's expansion and its effort to create a second plant at Reidsville. Looking at the big picture, which is what we submit the law requires, that evidence creates a tribal issue on the core question of whether the exclusion of NTE was improper. And what if we don't look at it in the big picture, holistic approach that you suggest? Could you still prevail? Yes, Your Honor. We think that in addition to failing to engage in a holistic analysis, the district court also erred in its analysis of predatory pricing law and refusal to deal law. I'll start with predatory pricing. Well, let me ask you just before you get into that, isn't the predatory pricing and refusal to deal just subclasses or subparts of the notion of an improper exercise of monopoly power? I mean, it seems to me if you have monopoly power in a particular market, you don't lose the ability to compete, but you are watched more closely on the type of conduct you carry on against competition or potential competition. I think that's right, Your Honor. And that can include predatory pricing and refusal to deal, acts, that type of thing. Yes, I think that those refusal to deal and predatory pricing are frameworks that the courts have used to analyze particular kinds of conduct that a monopolist can engage in to determine whether that conduct is unlawful. And to Your Honor's original point, I would agree that there is conduct that a monopolist is forbidden from engaging in that a non-monopolist may be free to engage in. Is there an intent element? Absolutely, Your Honor. And I think the intent element is key. I didn't want to get you off on this because Judge Thacker's asked you a question. I interrupted, so I'll let you answer that question. This is all useful. I think the intent element is, in fact, key. I'll take Trinko as an example. I do want to go back to predatory pricing. But if the court looks at Trinko, the key throughout Trinko is intent. And the court is asking the question of whether the monopolist forwent a voluntary course of conduct, a voluntary prior relationship, because it's trying to get at the question of whether there was, in the court's words, anti-competitive malice. So the court, going all the way back to the cases that I think are very well set out in both in the media opinion, the court is focused throughout on the question of whether there is anti-competitive intent. In other words, is the monopolist trying to prevent competition as opposed to engaging in competition on the merits? And I think the answer here is very clearly yes, because for one, Duke admits that it cannot compete on the merits, by which I mean competing on the basis of price or better quality. Of course, electricity is a commodity, so there's really no such thing as competing on the basis of better quality. So here, it's a commodity, so it's a question of price. And the record is abundant, certainly sufficient for summary judgment purposes, that Duke could not compete based on price. So what did it do? It tried to prevent NTE from competing based on price. And one of the ways that it did that was through this below-cost pricing scheme that it used to prevent NTE from obtaining a new contract with Fayetteville. Before I go into the pricing aspects of the predatory pricing issue, I just want to emphasize one critical feature of the structure of this market. There are very few customers that come up for renewal in this market. And in this particular time frame, Fayetteville was the critical customer for NTE to be able to enter this market. The documents show that there wasn't another big customer up for renewal. And so Duke knew that if it could prevent NTE from getting Fayetteville, NTE would not have the economies of scale necessary to bring its second plant, Reidsville, online. And so what did it do? Let's just say they recognized all of that. They said, this is a real threat to our cash flow. We want this customer. And in reaction, they say, OK, we're going to drop our prices. And I'm going to suppose at this point, they do not drop it below the appropriate price range. We have to discuss that here in the court. But let's say they stay above where it's a loss. I mean, we're talking about variable price versus a total price, that type of thing. But let's say they just drop their price to be competitive and make it very tough for NTE to come in. That's legitimate competition, right? It can be, but not in this instance. And I do want to get back to the measure of cost because our position is that we had evidence in the record in the form of an expert report that was unchallenged under Daubert that the prices here were below both average total costs and average variable costs, which in long-run industries like this tend to converge, as Judge Posner recognized in the MCI case. But we can bracket that debate. I think Your Honor's question asks that we do. There is another feature to the Fayetteville contract that goes beyond the level of the price. And that is the structure of the price. So what our expert said below, what we said below, is that in addition to the pricing level being below a proper measure of cost, there was, in essence, a monopoly leverage component to this because what Duke said is, I will give you, Fayetteville, a discount on the current period of your contract if you accept higher prices in the renewal period of the contract. NTE has no ability to compete with Duke in the existing period of the contract. It's a long-term exclusive contract. NTE can only compete for the renewal. So what that leveraging did, similar to tying, is it said, you can only have this discount in a timeframe that NTE doesn't compete for, can't compete for, if you accept higher prices in the time period that NTE can compete for. And if you look at Aretha and Hovenkamp, and you look at the secondary literature that we've discussed in our brief, that kind of conditional rebate structure has a separate foreclosure effect above and beyond just the level of the price. It forecloses NTE from competing for the renewal by offering something that NTE can't offer in the existing period. The district court never addressed that, never grappled with the question of whether the pricing structure was unlawful in addition to the pricing level. Going back to the pricing level for a moment, our brief at- Didn't the district court conclude that it was above average variable price? As to the pricing level, that's correct. The district court was focused just on a traditional Brook Group predatory pricing claim where the argument is that you drop your price today in order to try to recoup it later. And the court said, I think erroneously, given the evidentiary record, that there was no evidence that the price for Fayetteville was below average variable cost. But there was. If you look at the blue brief at pages 14 and 15, we cite Dr. Morris's expert report at JA 4488 to 4489. And what he says is that when you're talking about an industry where you're building power plants that are going to last for generations, variable costs and total costs converge. That's what Judge Posner said at MCI. And so whatever, like predatory pricing has to be sent, the issue of predatory pricing and the cost level has to be sensitive. Is that a question of law for the court to determine? I think it's the proper measure of pricing. Supreme Court just talks about the appropriate level. And the question is, when you look at a particular industry or particular market, whether you're going to use total costs or variable costs or something in between, you say they merge eventually when you have a industry that involves large expenditures, utilities, and in-place type of thing. Is that something for a court to determine? Or is that a factual question? Your Honor, I would say it's a mixed question. I think this court's decision in Greenville Publishing points the way. In Greenville Publishing, the court basically said the question of how to allocate costs, whether you call something variable, you call something fixed, is a highly fact-dependent question. It relies very heavily on expert opinions. Again, we had an unchallenged expert opinion saying that the costs here were below both average total costs and average variable costs. And so while the pure legal question of what the proper measure is may be legal, the application of that to a set of facts is going to be highly fact-intensive. And that's why summary judgment in this case was not appropriate, because we had competing expert testimony on the question of whether the costs here were below average total and average variable. And the district court just didn't recognize that that evidence was in the record. So if I may go back to Judge Thacker's question, we do think that even if you put aside the issue of whether you look at this holistically or you look at each sort of act independently, the district court erred on predatory pricing for fundamentally two reasons. One, it did not recognize that there was, there is this foreclosure effect from the structure of the pricing in addition to the level of the pricing. And on the level of the pricing, it inappropriately ignored evidence that the pricing here was in fact below average variable costs in addition to average total costs. And then third, if the court even needs to get to this issue, we submit that, of course, the average total cost measure is the appropriate measure under the law of the other circuits that we've cited. So the assumption is that during this foreclosure period, during the discount period, NTE will be excluded from the market and then the structure of that contract will then raise the price to recoup the losses. I think in my mind, that question sort of mixes the structure and the pricing level. I would say that as to the pricing level, the idea was that if NTE was deprived of the Fayetteville renewal, it would be foreclosed from its effort to expand into the market more generally. And the way that Duke would recoup its below cost pricing would be to be able to maintain the super competitive monopoly level prices that it had been used to charging for decades because NTE wouldn't be able to expand. So by blocking NTE from this critical contract, it would be able to recoup those losses from other customers because NTE wouldn't be able to expand into the market. As to the prices... I'm sorry, but I wanna switch gears for just a second before your time runs out. On the recusal issue, are you arguing that the district court judges failure to recuse is a separate basis that we should reverse the summary judgment or simply that if we do reverse the summary judgment, we should remand to a different judge? Our principal argument is that the court should reverse on the merits and in doing so, remand to a different district judge because the district judge should not have been presiding over this case. But we do also independently argue that there was prejudice from the failure to recuse that would independently warrant reversal. Can you tell us about that? You mean just that he went the other way from you? Is that the prejudice? I think the prejudice is that we were entitled to a district judge that didn't suffer from a conflict and that had not been previously recused in the case. We submit that the district judge made multiple errors of law and also ignored multiple facts in the record that would have warranted denial of summary judgment. What about the fact that our review on appeal is de novo? Does that discount your argument about prejudice since we're looking at this anew? We don't believe so. We cite a federal circuit case from 2012, which admittedly is not binding on this court, that rejected that very form of argument that error was automatically harmless in the posture of de novo review. I see that my time has expired, thank you. You can wind up if you wish. Okay. I do also want to say to Judge Thacker's question, which I'm sorry that it took so long for me to get back to, that we also believe that the judge misapplied refusal to deal law by failing to recognize that foregoing a voluntary course of dealing is essentially an evidentiary proxy for anti-competitive malice. If you look at Trinko, what the logic of Trinko is, is that if you had a voluntary course of dealing, that course of dealing was in italics, literally in the court's opinion, presumably profitable. And if you forego profit, presumably you're engaged in something other than competition on the merits. You're engaged in anti-competitive malice. That was the logic of Trinko. And here we submit we have direct evidence of anti-competitive malice. Moreover, we also think that there was profit sacrifice here because the record shows that the interconnection was profitable to Duke. We had to pay for the transmission facilities and Duke got to keep them. There's actually no pushback on that in the other side's briefs. They basically say, they don't deny that that arrangement is profitable. Thank you. Before you sit down, can I ask you about the recusal again? I'm really not sure how that fits in to the merits. Do you have to win on the merits to succeed in the recusal? Judge Watts, we have two separate arguments. I think one is that if we win on the merits, we recognize that there would need to be a remand for trial. So you want a new judge. So we would like that trial to occur before a judge wasn't previously refused. We also submit that independent of what we've been calling the merits, the antitrust issues, the fact that we were not given, that we were not able to get a ruling from a judge who wasn't previously conflicted is an independent basis for reversal. But I would consider that as our second argument. Do you have cases that do that? We cite, I believe some in our briefing and we cite the general standard that we think warrants reversal in this posture. Let me follow up that question. Is there a time period, the judge recognized a conflict during a period of time, but basically said that that was absolved and it's changed by circumstances.  could then get back into a case? We don't think the law permits that, Your Honor. There may be a justification for the judge saying, I'm not gonna recuse myself in new cases involving that firm after a period of time. I think that's quite common, but we submit that once a judge is recused, there is a bright line rule that the judge should no longer preside over that case in the future. So you stated that though in the passive, the judge recused himself, right? I mean, sometimes a party comes and says, is that what happened here? Did you ask for the judge to recuse himself? The judge recused himself so spontane. So I'm not sure that principle follows if he's recused only because he did it. In other words, it's not a pass, somebody else didn't ask for it. So he's the captain of the ship to begin with and then in the decision that he need not be recused. Judge Watts, I do not recall ever seeing that distinction drawn in the once recused, always recused cases. I know, I haven't seen it either to be sure. Okay, thank you. Thank you. Thank you, Mr. O. All right, Ms. Ratner. May it please the court, Morgan Ratner for Duke. There is a default rule that one company's unilateral conduct is not an antitrust problem. There are a few exceptions to that rule, but they're bounded by careful tests that the Supreme Court has laid out. And the Supreme Court has cautioned that even acts of pure malice are not an antitrust problem unless they're accompanied by the specific factors laid out in those conduct tests. So let me start with the predatory pricing conduct here, which was the focus of much this morning. I think there are at least four independent problems. Let me start with the how we view this. Opposing counsel argues we should view it holistically based largely on this Union Carbide Supreme Court case, I think, and you all want us to focus sort of on individual acts. What if we did view it, the sort of the reverse of what I asked opposing counsel, what if we did review it holistically, can you still prevail? Yes, we think we still prevail because there's no unit that can be added up to another unit in a way that makes sense. It's that zero plus zero plus zero equals zero that the district court. It is, or as Rita explained it. That really is a very superficial view of causation of any kind. It seems to me we have just numerous examples in the law where particular incidents don't amount to the causation or the conclusion we're trying to reach, but synergistically they do. And the court always talks about holistically and looking at the totality of circumstances. And those totality are probable cause. For instance, there are many incidents that you can look at and say none of them indicate that crime is afoot, but you put six or seven of them together, including a case like Terry out of the Supreme Court where you just had a few facts where they were just casing a joint. Not illegal, but in the total circumstances that the officer put together. So the idea that we have, they accuse you, I think, of four or five different incidents that contribute to what they think is anti-competitive conduct. And the question, I think, is whether we can look at those four and five and say, yes, you were competing or at least there's a question of fact about that. So Judge Niemeyer, the answer is when there is a specific conduct test laid out by the Supreme Court, if the behavior does not meet that test, it is a true zero. It's not a factor that goes in as one would into the probable cause analysis because it's pro-competitive conduct then, not anti-competitive. Well, that's, no, I understand that point. And that's a good point. And as a matter of fact, I think the predatory pricing is quite difficult because pricing is a legitimate method to compete with. And the question is, and I still question the whole concept myself, is to why is it predatory if it goes below cost and not predatory if it stays above cost? It seems to me you're still foregoing profits, but we have that doctrine quite a part. But I'm thinking in terms of you go to the state commission and you complain on the OASIS listing, you made a mistake. And the question is, they say it wasn't a mistake. They say it was deliberate and part of the effort to exclude. You say, oh, these were oversights. Well, isn't that the typical question of fact that a jury should resolve? Judge Nimoy, that is a question of fact, but the answer is not relevant here because again, the Supreme Court has put down a test. It's test for sham litigation is set out in the Professional Real Estate Investors Test. And it's that the party's position has to be objectively baseless. And here- I'm talking the overall notion of trying to expect with the intent, a Tranko type of thing, excluding somebody from the marketplace by numerous acts. And none of the acts would succeed and none of the acts might be independently sufficient or even indicative. But you put them all together. You say, these are accidents. They say they're deliberate. And then they say, we've got some of these emails that indicate some deliberateness. The question then comes is how do we resolve that? Judge Nimoy, the issue is since the early nineties, the Supreme Court has been putting down tests for different categories of conduct. And if, as soon as you don't meet that test, you can say, well, there's some other bad conduct too. Then you blow a hole through decades of doctrine and a rule specific approach to antitrust that the court has laid out. And I truly think this question- So you're going back to, we just cannot look at it holistically at all. You disagree with the synergistic approach altogether. I think Judge Sackert's both. So first, I just want to say one more thing on the holistically at all, which is if you look at the Supreme Court's decision and link line, page 457, the last substantive paragraph of the opinion could have been my opening here this morning. The court said, this is a refusal to deal claim that doesn't meet Trinco. It's a predatory pricing claim that doesn't meet Brooke Group. And you cannot add those together. Two wrong claims don't make a right one. I do not know how this aggregation theory can be squared with the court's most recent pronouncement on that or how you can have it again without undermining all of those boxes. Now, if you disagree, then I think the answer is at the very minimum, things that can be aggregated have to have that synergistic effect that Judge Niemeyer mentioned. And here, there's no tie between the purported refusal to deal claim and the predatory pricing claim. The refusal to deal claim resulted in NTE's own telling in a change in a system from, that should have said suspended, instead said terminated for nine months. That had absolutely nothing to do with the loss of Fayetteville. Fayetteville's testified they were unaware of this. So there's no relationship again. Did Firk agree that Duke's termination of the interconnection agreement was unlawful? Yes, Firk. And how does that impact your argument? So Firk said that it was a question that was unclear under its rules, that it needed to clarify. In fact, Duke supported Firk clarifying in that case. And this circles us back around to what I mentioned earlier, which is the test for when a position is a sham or pretext. And that is, was it objectively baseless? I think if you have a case where Firk has said your position, we didn't have a clear rule here, we ultimately side with one side rather than the other, then you cannot find that Duke's position there was objectively baseless. We also know that NTE didn't even pursue its contract claim. It ended up being the one that issued a promissory note to Duke on that. So again, we have a test. Well, it owed the money. The real question that they are arguing is whether the invoicing and the pricing was manipulated in such a sense where they could then sue for breach of contract. In other words, from their point of view, and I'm not saying we take that, I'm trying to understand what we have before us, but if I understand what they're saying, is they're saying, initially, they recognized that they couldn't compete with the efficiency that the NTE plant was producing. So they have, this is their position, they have an idea, Duke executives say, well, let's get them out of the market. And so the first thing they do is they give this huge discount to Fayetteville, which Fayetteville can't reject. There's a debate as to about whether that's below pricing or not, a variable average pricing or total pricing, whatever is applicable in this case. They say then they set up the invoicing to create a breach of contract suit. They say they reported the OASIS improperly. They say that was an accident. You say it was an accident. They say it was deliberate. They say you went to the state commission and improperly reported there. Oh, that was an oversight. And so they go on and on. They have four or five of these things, and they say that was part of this recognition that NTA was a competitor that we've got to keep out. And they say these acts were in furtherance. Now, let me just go back to the pricing. What if we had a board meeting? This is hypothetical. What if we had a board meeting in which the board said, we recognize predatory pricing violates the antitrust laws. We got to keep NTA out. Let's take our pricing right down to the average variance price. We're going to get no profit. We're not going to take a loss. We're going to get no profit. And then we've got a few other things we can do to get them out. Would that be a violation? I don't think- With that intent? I don't think so, Judge Niemeyer. And that's because as again, as the- I agree with you. That didn't violate. That's legitimate business practice. I recognize pricing is one of the big deals. I mean, making a better product, pricing, more efficiency, better service, all this. This is the way we compete in a market. But they have an intent to use their pricing. They clearly don't violate the law. They were guided carefully by their attorneys. So they took it down right to the level with zero pricing. And they say, that'll put a lot of pressure on NT. And then we've got a few other strings in our bow and we'll be able to get them out through the contract. We'll get them out, knock them off Oasis. They go to the end of the line, that type of thing. Is that sufficient to satisfy the overall claim that with monopoly power, they're trying to exclude competition? It is not, Judge Niemeyer. And again, I would take you back to Brook Group where the Supreme Court said very clearly, it can be an act of pure malice, but that does not matter unless it meets the conduct tests. And if you are not ticking off those boxes in the conduct test, then you do not have anything anti-competitive to add up. And that is because, as the court also explained, both in Brook Group and in Trinco, the concern in the antitrust laws is more about false positives than false negatives. If we have low prices, we are extremely reluctant to have any set of rules that would cause those to be a problem. And I do think I'm not asking for anything sort of remarkable or new here. This is the position that Judge Boasberg and Judge Mehta, both in DC, have just explained in the recent Google and Facebook decisions. The DC Circuit adopted Judge Boasberg's reasoning in its Facebook decision. The Federal Circuit has said the exact same thing in the Intergraph decision, the Second Circuit has said the same thing in Iotoni, and before that in City of Groton and Northeastern Telephone. Every court that has considered this, this type of aggregation has said the same thing. You can't add up things that are, as Arita explains it, different cardinal units. There's no sum that makes sense there. All of the cases that the other side- What about the, just take as a fact that they advance is the report to exclude them from OASIS. They, you confessed that you made an error in that, a mistake, oversight. They claim that was intentional. Is that meaningful? It is not. I would note they dropped this argument of defamation on appeal. Not defamation, it was an exclusion. It was a functional disadvantage. They ended up putting NTE, you ended up putting NTE at the end of the line accidentally. NTE, so what the district court said was there was a fight about the labeling for NTE that was resolved by the regulator. Duke had a position in that that was not a sham litigation and NTE was placed back in line with no evidence of anybody ever seeing any different labeling. So I don't think there's anything to add there. I do want to briefly touch on predatory pricing. Before you do that, I just have to ask you a fundamental question. I thought that the appellants were heavily in favor of aggregating everything and you all were heavily against it. Is that, if I misread you? That's correct. Okay, so I wasn't sure why that was so. So maybe you can explain that to me. So you believe if we do aggregate all of these things, they will prevail. Is that correct? No, that's not correct. Well, that would be a reason for opposing aggregation. So what is the reason you have? Well, so Judge Motz, we think that the case is very simple in this thorough district court decision that breaks things down into the boxes the Supreme Court has created. So that's our frontline position. Our backup position is even if you disagreed with that, these aren't meaningful units that can be added together and there's no supposed synergistic effect. They're frontline and sort of backup positions are flipped there. So I- Which you said to Judge Niemeyer a few minutes ago, zero, zero, zero doesn't- Correct, that is our frontline position. We think that is the only outcome consistent with link line. They say the link line decision can be rejected as a price squeeze specific claim. I don't see how it's possible to read that opinion and say, if only the plaintiffs had labeled it a course of conduct claim, it would have come out differently. And indeed- Then why do you oppose the aggregate approach? Well, Your Honor, we think that that is wrong legally for the reasons I just said, as link line described it as the DC circuit, federal circuit and second circuit have rejected as even the Aretha treatise they rely on. If you keep reading- But then your backup position is even if we do look at it in the aggregate, you would still prevail because of all of them. Is that your backup position? Correct, correct. And like I said, there are- Explain Union Carbide's language. Sure, so what that case dealt with is adding up the effects of conduct that was anti-competitive. So exclusive dealing, for example, are things that the antitrust law does not like. And- Yeah, but it's never going to be, in other words, the protagonist is never going to announce I'm doing something illegal. They're going to try to use what appears to be legal to accomplish an illegal end. In other words, they're trying to get NTA out by any means. That's from their posture. And you have a plan to oppose NTA. And in the aggregate, it has a tendency to have that effect. My biggest question is, what was Union Carbide talking about when they talked about looking at the totality of the circumstances? So what I was talking about is most antitrust conduct has a conduct component and an effects component. Yeah, I'm talking about the conduct here. I'm talking about excluding from OASIS and reporting to the state commission. All of these look like small events, but they're all consistent with an effort to knock NTA out. Now the question is, would have it had that effect alone? I don't know. And that's the key distinction. So the conduct in Union Carbide was itself anti-competitive. Exclusive deals are things antitrust law does not like. And so you can add up four exclusive deals, each of which forecloses 20% of the market. You can add up those effects. What you can't do is add up a failed predatory pricing claim, a failed refusal to deal claim, because those things are pro-competitive if they fail the test. Is there another distinction with Union Carbide based on the fact that in Union Carbide that was a conspiracy amongst several different entities? And here we're looking at one entity. That's correct. That's what Judge Mehta in the DDC has described the case as. I think if you go through as well, a Judge Boasberg's decision, he also walks through these. Now I do want to get to predatory pricing. Now I was going to get back to that. I was going to ask you specifically on that. How do you address their experts' testimony about whether the pricing in this case was predatory? Yeah, so the expert has, I would point the court to page 4488 of the Joint Appendix. The expert has used fully distributed costs, a measure of costs that no court has ever allowed and that a reader describes as nonsense. The expert used that and then has a line in his opinion where he says, well, in all events, I think it's probably comes out to the same thing as the correct measure of costs, which is some measure of marginal costs. That cannot possibly be enough to survive summary judgment to say I did the wrong thing, but I think it shakes out to approximately the right thing. So the district court was correct in rejecting that. I think even before you- Is the measure of costs, is it legitimate for a court to focus the measure of costs on the nature of the industry? It may be. I think it would still have to judge that as a question of law. We think the measure of costs, and the Supreme Court has said, has to be incremental or marginal costs. There are really two ways of measuring that, either average variable costs or long run incremental costs. There might be an argument that one or the other would be appropriate in the industry, but nobody has ever accepted fully distributed costs. The district court asked that of NTE, has anybody used the measure that you're trying to use here? And they said no. I do want to point out one more thing. I think the core of their predatory pricing argument has become some argument that these retroactive rebates were the predatory thing, and the district court shouldn't have used Brook Group. That is not just forfeited. If there's any error, that is invited error. At page 23 of their summary judgment briefing, they say, you apply Brook Group to our claim. Here's a retroactive rebate. That gets Brook Group as well. At page 37 of the summary judgment hearing, NTE puts Brook Group up on the screen and says, we're going to walk you through our pricing claim. Here's Brook Group, and here's how you apply it. So I don't think this court even needs to touch that. If you wanted to, the correct answer is the one in the ARETA provision they cited in the district court, but not here, 749E, that says the way to handle retroactive discounts is effectively to allocate the retroactive portion to the goods still in competitive play, and then to run the Brook Group analysis. If you did that here, it would change the measure of the contribution to fixed costs from something like 60 million to 55 million. Before your time runs out, I have a question on the recusal. How do you get around our language from the Arnold case where we said that when a judge, quote, recuses or disqualifies himself at any time, he is out of service insofar as that particular case is concerned? I think the Arnold case was talking about literally a currently recused judge, and whether that currently recused judge counted for a quorum for a vote. So I don't think it has any bearing here. But how can a judge recuse in a particular case and then bounce back in? So the district court here, Judge Bell said, I did not have a recusal here. I did not have a policy of recusing in cases in which it says- It says on the docket there was a conflict. That was at, the parentheses conflict was added there by a clerk, not the judge. But the judge, and you can see that because there's a distinction with Judge Cogburn's order where he actually specifies a conflict. But I think that here, what Judge Bell explained very clearly to the parties is, I had a policy for two years of not getting cases that involve my old firm that kept me from having to make a recusal. And this case involved the district court's old firm. Someone from his old firm appeared for, and then his old firm was off the case thereafter. But that doesn't negate that the old firm was involved in the case early on. I mean, that could taint the whole thing. Well, Your Honor, there's no rule, there's no statutory provision that says if the old firm is involved, that judge has to recuse. The question is whether a matter he worked on- The rule is once you're conflicted, you're always conflicted in that particular case. That's a strange proposition. In other words, I could, as a judge, after I got appointed, I could sit on cases that my old firm had when I was there? It could not have been matters, the same matters while you were there. That is the statutory rule, and that is the rule that- I know, but it's just a common sense rule. I mean, it seems to me that if my firm was in a case, I could not get in that case, even though I personally didn't have any- Judge Neumeyer, that's exactly correct. That would have been the actual rule, and that's the statutory rule, and that is what Judge Bell- So what was Judge Bell's situation? Judge Bell was avoiding deciding that question. He was avoiding deciding whether the firm had the matter when he was there. That was why he didn't do that- What do you understand was the firm's relationship to the case? The firm had no relationship to this matter. There was a lawyer- A representative client. There was a lawyer from his old firm who appeared for this client, but the firm had never had this case while Judge Bell was there. That's a statutory question that NTE does not appeal, and so the question is just, if he avoided deciding whether the matter had been there when he was at the firm, and then later- And Judge Bell said it's basically a prophylactic. He was just being cautious. And then he later sat down and did the work and said, I actually wouldn't have need to recuse here. I didn't recuse now that I'm thinking. I just add one briefly. If there ever were a case for homelessness, it would have to be one where the other side says there's no actual bias. We dropped appearance of bias, and the only argument here is this sort of technical rule this court has never before stated and is up here on to no vote review. Thank you. All right, thank you. Mr. Hull. Thank you, Judge Meemeyer. May it please the court. Duke's counsel said repeatedly that their position is that you can't aggregate or look at this holistically because there is no common denominator, no synergistic effect. Respectfully, on summary judgment, that is not a fair characterization of this record because our whole point is that Duke took these different acts in order to prevent NTE from expanding and more specific than that, to prevent NTE from being able to bring a second plant, Reidsville, online So what unifies these acts? Well, I think if I understand correctly, and you can take it from here, but just take the pricing as one point. Let's assume that from their point of view, the pricing was above the appropriate level. It was close, but it was above, and they competed with price. So that's not a violation. And they say, okay, we competed with price. That's perfectly good business practice. Another thing we did is we decided to update all our plants so they became more efficient because we want to beat out NTE. She'd say that is also an independent act. That's not illegal. They could do that. And so those types of things are absolutely correct, right? I mean, Duke could pursue legitimate business practices and compete vigorously in the marketplace. I think, Your Honor, that what the holistic analysis calls for is to look not just at the little picture, but at least also at the big picture. And the big picture here is that when you look at the overall effects of the course of conduct that Duke engaged in, what happened as an end result is that a more efficient rival was prevented from competing in a market dominated by the monopolist. And that is quintessential improper exclusion by any definition. Now, if Duke could actually go through all of the record and say there is not one iota of evidence that that was a product of anything that could have anti-competitive effects, then maybe it could brush away the big picture and say it must have been something else that was completely pro-competitive. But I think as many of Your Honor's questions directed to Duke's counsel indicate, many of these acts are certainly potentially anti-competitive. And I would also add, many of them don't have any particular conduct rules that go with them. So the big picture matters as much as the little picture. And I would say to the question of whether these are quote-unquote true zeros, that is the flaw in the district court's logic. Not only is it superficial, but a predatory pricing claim like that, or something that is at average variable cost but not one iota below, that's not a zero. Brookgroup never said that that could never, in combination with other things, have anti-competitive effects. Nor did Trinko ever say that a refusal to deal that doesn't meet whatever one thinks are the standards for a pure refusal to deal could never be anti-competitive in combination with other things. Those cases don't stand for those propositions. They stand for the proposition that viewed in isolation, a pure refusal to deal that isn't accompanied by foregoing a presumably profitable prior course of conduct is not actionable. And to Linklein, Linklein, if you read it, is very clearly about the particular theory that the plaintiffs were advocating there, the price squeeze theory, which was just a combination of a predatory pricing claim and a claim that the wholesale prices were too low. And so the logic of Linklein is not to reject decades and decades of court cases going back to Union Carbide that say that the fundamental issue is whether there was improper exclusion based on something other than inefficiency. It was the court's maybe elegant way of explaining why the price squeeze theory in particular was not actionable. I would go back again just to the clear evidence that the common thread unifying all of the acts that Duke took was to foreclose NTE from bringing the Reidsville plant online because it knew that if Reidsville went online, Duke would lose more customers, NTE would be able to expand in its market, and Duke would lose the ability to charge the monopoly prices that it had been so used to charging over the past decades. What's the status of the Reidsville plant? It is currently not online. Is it under construction or? I couldn't tell you sitting here right now exactly what the current state of it is. I apologize, Your Honor. If there are no further questions, I thank you for your time. All right, thank you, Mr. Ho. We'll come down and we thank you for your arguments. Apologize for the heat again. I don't think it heated the arguments. They were excellent, and we'll come down and greet counsel, take a short break.
judges: Paul V. Niemeyer, Stephanie D. Thacker, Diana Gribbon Motz